[Civ. No. 17863.   Second Dist., Div. Three.   June 29, 1951.]

SWEDLOW ENGINEERING COMPANY, INC., Appellant,
v. R. H. FLICKINGER et al., Respondents.

Laurence J. Rittenband and Jack Gold for Appellant.

Arthur J. Speight and C. J. Walker for Respondents.

WOOD (Parker), J.—In this action for breach of contract, plaintiff appeals from a judgment of nonsuit.

On January 15, 1948, plaintiff was awarded a contract by the State of California for the construction of 4.9 miles of public highway north of Trona in Inyo County. The contract provided that it should be completed before the expiration of 150 working days after the approval of the contract by the attorney general. Such approval was given on January 28, 1948. The approximate time for the completion of the contract was August 1st.) The proposed highway was 25,860 feet in length, and it was divided into 258 stations which were 100 feet apart. The station at the south end was station 0/00 and the station at the north end was 258/60.

On January 29, 1948, the defendant Flickinger signed a letter, which was prepared by and addressed to plaintiff, wherein it was stated in part: "We propose to furnish all labor, insurance, material, and equipment (including transportation) and to perform in full the work of 'Roadway excavation' and 'Overhaul' as defined in your contract" with the State of California "between approximately station 165¬00 and approximately Station 237¬00 for the unit price of one dollar per cubic yard for 'Roadway Excavation' . . . subject to the following conditions: (a) It is understood that the nature of the work involved in this proposal is primarily rock excavation requiring drilling, blasting, shovel excavation. . . . (b) It is understood that the quantity of roadway excavation to be moved by us will be between approximately 50,000 and approximately 75,000 Cu. Yds. (c) It is understood that as a prime condition to this proposed agreement, we specifically agree to prosecute the work described herein in such manner and according to such schedule as will conform to your general progress schedule. (d) It is understood that all men employed by us on this project will be carried on your payroll and that at the end of each pay period we will reimburse you in full for the amount of such payroll plus workmens' compensation, insurance, and employers share of social security and all other payroll taxes. . . ." Plaintiff accepted said proposal on said day by writing and signing an acceptance of it below the signature of defendant Flickinger.

The defendant Welker was a partner of defendant Flickinger, but it does not appear that Welker was a party to the written contract. On several occasions Welker negotiated with representatives of the plaintiff concerning the construction work. It appears (according to a statement of counsel for respondents in connection with his motion for a nonsuit) that "this contract was turned over to the partnership, Flickinger and Welker and operated as a partnership job." Counsel for appellant stated in effect in his closing brief (p. 3) that counsel for respondent stipulated that the subcontractor was the partnership of Flickinger & Welker. We have not found that stipulation in the record.

As above shown, the portion of the road to be excavated under the subcontract of January 29, 1948, was between approximately station 165 and approximately station 237. Defendants commenced the construction work on February 4, 1948, at a point north of station 165 and worked south to station 161. Mr. Johnson, the secretary-treasurer and general

manager of the plaintiff company, testified that the nature of the work required that excavation in that particular cut extend farther south than station 165 in order to get sufficient fill material. When defendants arrived at station 161, the plaintiff rented defendants' equipment (shovel, trucks, compressor, and caterpillar) and used it for 10 days in constructing the road from station 161 south to station 158. Mr. Johnson also testified that prior to the time the subcontract was signed he discussed with defendant Welker the length of time plaintiff had in which to complete the road; and he explained to Welker that the job should be completed not later than August 1st, and in order to meet the completion date it would be necessary that all the excavation work be completed by June 20th, which would allow plaintiff about 30 working days to do the surfacing of the road; that Welker replied, "Don't worry about our getting the job done on time"; that during the conversation he (Johnson) mentioned the fact that plaintiff would be doing the earth work (on the portion of the road to be excavated by plaintiff) while defendants were doing the rock excavation (on the portion of the road to be excavated under the subcontract), and that plaintiff would like to see the job progress in such a way that the earth work and the rock work would progress "somewhere nearly at the same rate so they would be completed somewhere near the same time."

There were approximately 75,410 cubic yards to be excavated between stations 161 and 237. Mr. Murphy, who was plaintiff's superintendent of said construction work, testified that on March 20, 1948, the defendants had excavated approximately 9,000 cubic yards, which was about 12 per cent of the total number of cubic yards to be excavated; on said March 20th he told Welker that at the rate defendants were working the plaintiff could not finish the contract within the allotted time; Welker assured him that the progress would improve; several times thereafter and prior to April 3d he asked Welker if defendants were going to finish on time; and in reply thereto Welker replied that progress was improving. Mr. Johnson (general manager of plaintiff company) testified that on March 31st the defendants had excavated 15,988 cubic yards. On said date about 21 per cent of the total number of cubic yards had been excavated, and about 43 per cent of the allotted time had elapsed. Mr. Johnson also testified that about April 3d he told Flickinger that defendants were behind schedule and that their part of the work was not progressing satisfactorily,

that plaintiffs had substantially completed their part of the excavating and that their earth moving equipment was then at the north end of the project; that he (Johnson) asked Flickinger for permission to move that equipment in south of station 237 to see whether they could speed up the progress and "move any of that material south from 237 with our earth moving equipment"; that in reply thereto Flickinger said, "Yes, go ahead"; that he (Johnson) then instructed Mr. Murphy to start the equipment in south of station 237; thereafter between April 3d and April 20th plaintiff proceeded with the work south from station 237, but during that time it encountered such difficulties in attempting to move the rock that it was a futile effort to try to make any headway with the earth moving equipment.

When the plaintiff undertook to remove the material south of station 237, Murphy and Johnson expected to remove the material "a lot faster than it came out." On April 20th defendants had moved about 25 per cent of the total amount of material to be moved under the subcontract, and about 57 per cent of the allotted time had elapsed; and plaintiff had completed about 95 per cent of the excavating which it was to do between stations 0/00 and 161 and between stations 237 and 258/60.

On said date, April 20th, a conference was held at Trona at which Murphy, Johnson, Swedlow, Flickinger and Welker were present. Mr. Murphy testified that at said meeting Mr. Johnson said that he had called them together to see if they couldn't work out some method of improving the progress, that the state engineer had started to squawk about the work not going according to schedule, and that he (Johnson) "wanted to know if defendants intended to put up additional equipment in there to bring the thing up to schedule" so that it would be completed on time; that Flickinger replied, "I am not going to bring in any more equipment. We are in this thing over our heads now," and that they had put into it as much as they could, they could not go any farther, and "if there was additional equipment brought in it would have to be brought in by somebody else"; that he (Murphy) then said that "if we [plaintiff] were going to do it, that we would have to have a power shovel and some truck equipment"; and that Johnson then said he had found that a power shovel and some trucks were available; that "it was decided then that 210 or 214—210, I believe—would be the most logical point to stop that operation if that equipment came in from the

north''; that as they were getting ready to leave the meeting Johnson asked Flickinger to send him a letter ''as you understand this meeting here, or as it applies to the overall picture of the general contract.''

Mr. Johnson testified that at the conference of April 20th he opened the conversation by telling Flickinger that defendants were behind in their portion of the work, that at the rate the work was progressing plaintiff would not be able to complete the job on time, that something would have to be done to speed up the work; he asked Flickinger if he would move additional equipment to the project in order to speed the progress of the work; Flickinger said: ''I will not move any additional equipment to the project. We have lost all the money we are going to lose on this job. We can't stand to take any more loss, and if any additional equipment is moved onto the job you will have to do it''; Johnson replied that '' [I]n as much as he was refusing to put additional equipment on the job to fulfill the contract within the required time, we would be forced to rent some equipment outside and to place it on the job,'' on that portion of the work between stations 161 and 237; that he (Johnson) said further, '' [I]f we move the additional shovel or additional equipment in we should get together and coordinate the work so that the work being done by Flickinger and Welker would not conflict with the work being done by the other shovel which was to be brought in''; he (Johnson) also said that plaintiff would start its shovel at station 237 and would work south to a junction with defendants' shovel which was coming from the south; Flickinger or Welker said that it appeared that the place where this junction would occur would be approximately station 210; that he (Johnson) ''agreed in substance that from all appearances that would be the possible place where our operations would come together. It appeared feasible that it would work out that way''; he asked Flickinger if he would address a letter to plaintiff confirming the discussion and his understanding of the conclusions reached at the meeting, ''so that there would be no conflict with our agreement or contract for the portion of the work being performed by them.'' On April 29th the defendants sent the following letter to plaintiff:

''In confirmation of our conversation at Trona, California, April 20, 1948, wherein it was agreed by all parties concerned regards the Trona Highway project, that we, Flickinger and Welker, would cease work upon reaching Station 210 / 00.

''If this meets with your understanding, please sign accept-

ance below and return duplicate copy, retaining original copy for your files.

Very truly yours,
Flickinger & Welker
R. H. Flickinger
Partner

ACCEPTED:
Swedlow Engineering Co., Inc.

By_____
Dated:_____ .''

The plaintiff did not sign the acceptance form on that letter.

On May 15th the plaintiff sent the following letter to Flickinger:

''Referring to your letter of April 29, 1948 from Flickinger and Welker to Swedlow Engineering Co.

''In our conversation in Trona, California on April 20, 1948 with reference to the progress of the work on the Trona highway project, it was agreed by all parties present that progress on the portion of the work covered by our agreement of January 29th was behind schedule and that it would accordingly be necessary to put additional equipment to work in order to insure completion of the work on time. Upon being asked if you would be willing to do this you replied that you definitely would not and that any additional equipment needed would have to be furnished by us. It was then stated that there being no other alternative we would hire the necessary shovel and trucks from other sources and work southward from the north end of the job to a meeting with your operation progressing from the south. An estimate then made of the total unfinished work indicated that such a meeting would possibly occur at approximately 210/00, and a tentative plan of operation was made accordingly. In reply to our request you stated that you would confirm your approval of our action by letter.

''At no time during this conversation was it agreed that you would cease work at any specific station.

Very truly yours,
SWEDLOW ENGINEERING Co. INC.
Paul M. Johnson
Paul M. Johnson
Secretary-Treasurer.''

The letter from plaintiff was prepared by Johnson and was

submitted to plaintiff's legal advisor for approval, but the attorney did not change it substantially.

In the early part of May plaintiff rented a power shovel and other equipment and then proceeded with the construction work southerly from station 237.

Mr. Johnson testified that in the early part of June he told Welker that Murphy had told him that Welker intended to stop work with the shovel about June 15th; Welker replied that they had another job to move the shovel to, and that they had to get the shovel out of the Trona job by June 15th; he asked Welker about the rest of the work that is to be done; Welker replied that they (Flickinger and Welker) could complete the work between the place where the shovel will stop and station 210 with bulldozers; he (Johnson) said there is still additional shovel excavation beyond 210; Welker said they had agreed at the meeting on April 20th that they would quit at station 210; Johnson said that he had received a letter from Flickinger stating the same thing, but there had been no such agreement; and he showed Welker a copy of the letter he had sent to Flickinger; Welker replied that as far as he was concerned the shovel was going to stop on June 15th and that if any other arrangements were to be made they would have to be made with Flickinger's consent; thereafter Johnson related to Flickinger the conversation he had had with Welker, and stated that he objected to the shovel being removed before all the shovel work on the Flickinger and Welker portion of the job had been completed; Flickinger replied that it was his definite understanding from the meeting on April 20th that their operation was to stop at station 210; he and Flickinger then consulted the plans to see what could be worked out to further coordinate their efforts; between stations 196 and 198 there was additional material which should be put into the fill at station 214, and that between the place where that material was located and the fill there was a cut (between 210 and 213) which had not been removed; Flickinger said he would instruct Welker to remove the material between stations 210 and 212-50. Defendants' shovel was removed from the job about July 12th. The excavation work which was being done by plaintiff southerly from station 237 and the work which was being done by defendants northerly from station 161 reached a junction at station 214 a few weeks after July 12th. The entire project was completed on October 13, 1948. After the project had been completed, the State of California, upon request of plaintiff, extended the time for

completion of the project to the date of actual completion, namely, October 13th, and did not exact any penalty or damages for the delay.

The accountant for plaintiff testified that the records of plaintiff show that the costs incurred by plaintiff for rock excavation between stations 214 and 237, not including costs of defendants, was $67,829.34. Plaintiff asserts in its brief that, by reason of being compelled to take over defendants' portion of the work between stations 214 and 237, plaintiff was damaged in the net amount of $63,569.96, after crediting defendants' account with the agreed contract price of $1.00 per cubic yard for 26,319.4 cubic yards which it excavated for defendants' account. The full contract price (under plaintiff's contract with the state) was paid by the state to plaintiff.

Appellant (plaintiff) asserts that it was "a prime condition" of the subcontract that defendants would prosecute their work between stations 165 and 237 in such a manner that their work would conform with plaintiff's general progress schedule; that defendants, in their work, had fallen substantially behind the progress made by plaintiff, and they refused to bring their work up to schedule because they were losing money under the contract; that "whether plaintiff had completed its own work much sooner than expected and thus forged far ahead in completion" is immaterial on the question of defendants' obligation to complete their portion of the work by June 20th; that defendants did not complete their contract—they "stopped work and abandoned the contract at Station 214 instead of Station 237."

Respondents (defendants) assert that plaintiff voluntarily assumed the performance of a part of the work included in the subcontract without any intention of charging defendants therefor; that plaintiff expected a fairly easy job in excavating south from station 237 and expected to make money on that work; that plaintiff wanted to be sure it had permission from Flickinger before it did part of the work included in the subcontract, so that "there would be no conflict" with the subcontract, and that plaintiff would not be sued by Flickinger for moving in on his part of the work.

"A motion for a nonsuit may not be granted where there is evidence of sufficient substantiality to support a finding for the plaintiff, and in arriving at a conclusion on the question the evidence should be viewed most favorably to the

plaintiff with every legitimate inference drawn in her [plaintiff's] favor and conflicts disregarded." (*Milana* v. *Credit Discount Co.*, 27 Cal.2d 335, 342, 343 [163 P.2d 869, 165 A.L.R. 621].) Under the evidence here questions of fact for the determination of the trial court included the following: Whether there was a work progress schedule? Whether it was the intention of the plaintiff and the subcontractor that the plaintiff, in performing a part of the work included in the subcontract, should be compensated by the subcontractor in the reasonable value of such work? Whether it was the intention of the plaintiff and the subcontractor that the plaintiff should perform a part of the work, included in the subcontract, at plaintiff's cost and for the compensation to be received by plaintiff from the state? ▌▌ Viewing the evidence in the light most favorable to the plaintiff, it might have been inferred that it was the intention of the plaintiff and the subcontractor that plaintiff should be compensated by the subcontractor in the reasonable value of such work performed by the plaintiff. Under such view of the evidence, it cannot be said that the evidence was not of sufficient substantiality to support a finding for the plaintiff.

It was error to grant the motion for a nonsuit.

The judgment is reversed.

Shinn, P. J., and Vallée, J., concurred.

A petition for a rehearing was denied July 17, 1951.